## BLACK *vs.* BLACK.

### *In the matter of the Estate of* JOHN BLACK, *deceased.*

BY the Constitution of the United States, and the Act of Congress of May 26, 1790, the same faith and credit are required to be given to a judicial record in all the States of the Union, as it possesses by law or usage in the State where the judgment was rendered.

Judgments in other States, fairly and regularly obtained, are full and conclusive evidence of the matters adjudicated. This doctrine, however, is held in subservience to the principle that to entitle the judgment to full faith and credit, the court in which it was rendered must have had jurisdiction of the persons, and of the subject matter.

Jurisdiction of the subject matter is to be tested by the authorized extent of the powers of the court, in regard to the alleged cause of action. Having jurisdiction of the subject matter as alleged, the merits of the decision upon the facts of the case cannot be investigated and criticised collaterally in another tribunal.

No one is bound personally by judicial proceedings, without express or constructive notice ; and the judgment of a court of competent jurisdiction in another State may be questioned, on the ground that the defendant did not receive notice of the commencement of the suit.

The recitals of the record of a judgment in another State, asserting due service of process upon the defendant. are not conclusive evidence of the jurisdiction of the court over the person, but they afford presumptive evidence of the fact, and will be held conclusive unless clearly and explicitly disproved.

The defendant must disprove every mode of lawful service of process, so as not to leave the mind of the court in doubt.

Where in the record of proceedings for a divorce in the Court of Chancery of the State of New Jersey, the allegations contained in the bill of complaint were sufficient to authorize the jurisdiction of the court, the process was returned " served" by the sheriff, and the proofs sustained the charges of the bill,—*Held*, that the decree could be questioned collaterally only on the ground that the court had not obtained jurisdiction over the person of the defendant.

At the time of the institution of the suit, the defendant was a resident of the State of New Jersey, had been living there, occupying furnished apartments, over a year, and had no other domicil. Though it was alleged that at the time of the issuing of the subpœna to appear and answer, she had, without removing her furniture, left her abode, for the purpose of a temporary visit to the State of Connecticut, with the intention of not returning, yet it was held that she had not effected a change of domicil, from the fact that she had not acquired a new residence. A change of residence does not rest in mere intention. The domicil can be altered only by a conjunction of the fact with the intention.—*Held*, also, that as a resident and citizen of New Jersey, the defendant was amenable to its laws and bound by their provisions relative to constructive service of process.

The statute of New Jersey allowing service of a subpœna to appear and answer, by leaving a copy thereof at the defendant's " dwelling-house or usual place of abode," and the process having been returned " served " by the sheriff,— *Held*, that service by copy should be affirmatively disproved ; and that to suppose a violation of duty on the part of the sheriff, would require evidence *so complete and stringent as absolutely to exclude any solution consistent* with his innocence and integrity.

The return of an officer as to the service of process cannot be impeached collaterally, but may be impugned only in an action for a false return, or on the indictment of the officer, or in an application to the court issuing the process, made by a party interested in the cause.

The court will not, as against an innocent party, lean to the invalidation of a decree of a court of competent jurisdiction, on the ground of an alleged want of service of process, where the proceedings were all regular on their face, the defendant had notice in fact that the suit was instituted, and a decree had been pronounced, but did not apply to be heard, or to have the decree opened, and instituted no judicial proceedings until after the death of the complainant, and of the officer the truth of whose return was questioned.

A. H. DANA, *for Petitioner.*

By advice of counsel, the parties having submitted the question involved in this application, as a test of their respective rights relating to the estate of the deceased, the

same deliberation will be required as if the Surrogate were passing upon the final distribution.

The following propositions are insisted upon in behalf of Mrs. Rebecca Black, in respect to the validity of the decree for divorce in New Jersey, which is set up against her claim to administration :—

I. That no decree or judgment in a neighboring State is valid against a defendant who was not served with process and has not voluntarily appeared, but that the same is absolutely void.

II. That the record of such a decree or judgment, if it shows on its face the service of process or the voluntary appearance of the party, is only *prima facie* evidence of that fact, and that proof is admissible to contradict it.

III. No acts of defendant, as the omission to move to set aside such judgment or decree, or any other act which might be termed *laches* if a mere irregularity were in question, will be an estoppel, or can in any manner impair the right of defendant to contest the validity of such judgment, whenever it shall be attempted to enforce it in this State.

IV. Any objection to the jurisdiction of a court of another State, which would have been fatal had defendant appeared and made the objection, is equally available here whenever it shall be sought to enforce the judgment, and this may be done collaterally. As the Court of Chancery of New Jersey may decree a divorce for desertion only when the defendant is charged with desertion for five years, and has resided during the whole of such period in the State, if there was in fact no such residence of five years, a judgment of divorce would be *per se* void.

V. If by the law of New Jersey any other than personal service should be made sufficient to warrant a judgment,

such law would be inoperative in this State, and a judgment on an action so commenced would be void, as being repugnant to natural right.

If these propositions are sustainable, the questions of fact to be inquired into in this case will be—

1st. Was Mrs. Black, the defendant in the divorce suit, personally served with process?

2d. If not, has she done any act that would in law be an estoppel against objecting to the decree?

3d. Was she a resident of New Jersey the length of time required by the law of that State, in order to give the court jurisdiction to grant a divorce on the ground of desertion?

The last question it will be unnecessary to consider. If there was no personal service of process, the decree would in that case be void; and if there was such service it would perhaps be just to hold, that she ought then to have defended in New Jersey and set up the want of jurisdiction.

1. As to the effect of a judgment or decree in an action, in which there was no personal service, and no appearance by the defendant.

In this State the decisions are uniform, that such a judgment would be void. *Borden* vs. *Fitch*, 15 *J. R.*, 121, is the leading case. It was argued by eminent counsel, and was decided with deliberation by an able court. The divorce which was in question in that case was granted by the Supreme Court of Vermont, and the record recited that defendant had been duly notified to appear, but had neglected to do so. It did not appear that defendant had actual notice, and by the laws of Vermont, publication in the newspapers was made sufficient notice. C. J. Thompson said " that to sanction and give effect to such a divorce would be contrary to the first principles of justice. To give any binding effect to a judgment, it is essential that the court should have jurisdiction of the person and of the subject matter * * * The want of jurisdiction makes it utterly void and unavailable for any purpose. The cases in the English courts, and in those of our sister States, as well as in this court, are very

strong, to show that judicial proceedings against a person not served with process to appear, and not being within the jurisdiction of the court, and not appearing in person or by attorney, are null and void. We refer to the cases of *Bissell* vs. *Briggs*, 9 *Mass.*, 464; *Kibbe* vs. *Kibbe*, *Kirby's Rep.*, 119; *Barber* vs. *Root*, 10 *Mass.*, 262, and to cases in our own courts; and also notice the case of *Mills* vs. *Duryee*, 7 *Cranch.*, 481, and hold that the decision in that case must be limited to judgments in actions in which defendant had appeared, or had the opportunity of doing so."

In *Andrews* vs. *Montgomery*, 19 *J. R.*, 162, the rule in *Mills* vs. *Duryee* was recognized, with the qualification that it must appear that the court had jurisdiction of the person. (*Per Spencer, C. J., p.* 164).

*Shumway* vs. *Stillman*, 4 *Cow.*, 292. The same qualification is again asserted, subject to which it is admitted, that the judgment of a court of another State is conclusive,—the record itself, however, the court say, is only *primâ facie* evidence of jurisdiction, and may in that respect be controverted.

*Starbuck* vs. *Murray*, 5 *Wend.*, 148. The question in this case was whether a judgment obtained in Massachusetts, which recited that the defendant appeared, was an estoppel to his showing that he did not appear, and it was held not to be. Marcy J., said that the jurisdiction of the court is questioned for the purpose of showing that the supposed record is not in truth a record—"it is reasoning in a circle to say that it is a record, because it recites that defendant appeared, and that he appeared because it is so recited in the record. Unless a court has jurisdiction, it can never make a record which imports absolute verity against a party over whom it has usurped jurisdiction, and he ought not therefore to be estopped from proving any fact that goes to establish the truth of a plea alleging want of jurisdiction."

*Shumway* vs. *Stillman*, 6 *Wend.*, 447. This was the same case that was reported in 4 *Cow.*, 292. The question was then upon demurrer to a plea: it was in this case upon the

effect of a record produced at the trial, in which record it was recited that defendant appeared by attorney. This was held *primâ facie* sufficient, although it appeared that there had been no service of process, but it might have been disproved by defendant.

"An examination of the cases," (says Savage, C. J.) "results in the establishment of the following proposition : That the judgment of a court of general jurisdiction in any State in the Union is equally conclusive upon the parties in all other States. This, however, is subject to two qualifications : 1. If it appear by the record that the defendant was not served with process, and did not appear in person or by attorney, such judgment is void. 2. If it appear by the record that the defendant appeared by attorney, the defendant may disprove the authority of such attorney to appear for him." This decision is reiterated in *Noyes* vs. *Butler*, 6 *Barb.*, 613, except that it was held that if the record does not show jurisdiction the defect cannot be supplied by parol evidence.

*Bradshaw* vs. *Heath*, 13 *Wend.*, 407. A divorce obtained in Connecticut, without notice to defendant, was declared void. The question is discussed at some length how far divorces granted in one State shall be operative in other States, but is left undecided. In this case, the record did not show that defendant had notice : it was also proved that at the time the divorce was granted defendant was residing in New York.

The court did not, in the case last cited, consider the question of residence in any other view than as bearing upon the fact of actual service. Residence is to be distinguished from domicil, if any effect is to be given to it varying the ordinary right to personal notice. If by the law of a State, suit might be commenced without personal service of process, it might be said that citizens of the State are subject to the law, although citizens of other States might not be. But it is evident, that mere temporary residence would not constitute such a citizenship, as should be subject to such important consequences. Domicil, which imports an intention of per-

manently abiding in the State, would be necessary as the basis of such implied legal obligation.

The question is not without difficulty, whether the marriage contract ought ever to be dissolved, except according to the laws of the State or country where it was contracted; and there certainly is good reason for holding that the dissolution ought not to be subject to the *lex loci*, unless both parties have become citizens of the State or country where the divorce is sought.

The laws of Scotland are in this respect defective, in admitting the residence of one of the parties, as sufficient to give authority to their courts to decree a divorce according to their laws. In England the rule is different, it being there held that the marriage of English subjects cannot be annulled except according to the English laws. (*Story's Conflict of Laws*, §§ 597 *and* 218; *Lolley's Case*, 1 *Russell & Ryan's Cr. Cas.*, 237; *Warrender* vs. *Warrender*, 9 *Bligh*, 122).

Residence in one of our States is slight evidence of citizenship, in the sense referred to in the rule before mentioned. Our people change their residences for business purposes with great facility, and it would be unsafe to hold that a man's migration to one or another State, even if he has his family with him, shall be considered a deliberate election to assume all the obligations that would attach to a native-born citizen of such State.

In the courts of our State it has been held, that a temporary residence, of *both husband and wife*, in another State, was not sufficient to give the courts of that State jurisdiction to grant a divorce for causes not recognized by the laws of this State, when such residence, was for the purpose of obtaining such divorce. (*Jackson* vs. *Jackson*, 1 *J. R.*, 424; *Pawling* vs. *Bird's Exr.*, 13 *J. R.*, 192.)

In the last case, the judgment was given upon other grounds, but the previous decision was adverted to. Per Platt, J., p. 208. See also the remarks of Savage, C. J., in 13 *Wend.*, 421.

In Massachusetts the same principle was recognized in the

case of *Barber* vs. *Root*, 10 *Mass.*, 260. The parties had been divorced in Vermont, but it appeared that they had established their residence in such a manner as to prove a permanent domicil. This was held sufficient to give the court jurisdiction, but Sewall, J., says, "The laws of Vermont, which authorize the Supreme Court of that State to proceed in suits for divorce in favor of persons resident there for a time, but having no settled domicil within the State, against persons resident and domiciled in other States, upon allegations of offences not committed within the State, * * cannot be justified by any principles of comity." He adds, that such a course of proceeding is injurious to the morals of the people of other States, and ought to be reprobated and counteracted by legislative provisions in the other States.

Upon the general question of the effect of a judgment without personal service of process, it can admit of no doubt that such a judgment would be void in our courts, in an action between citizens of our own State. The only difference between this and a judgment in the courts of another State is, that it might be necessary in the former to apply to have it set aside, but if the record did not show personal service even this would not be required. A class of cases that might seem to constitute an exception, viz.,—where notice, by publication, is allowed by statute, and when judgment is allowed against several joint debtors by service of process upon one,—will be found, upon examination, not to conflict with the principle above stated.

The cases in which a suit could be commenced by publication, related only to real estate, as in the foreclosure of mortgages or in partition, until, by the Code, § 135, § 2, it was authorized in personal actions "where the defendant being a resident of the State has departed therefrom, with intent to defraud his creditors, or to avoid the service of a summons, or keeps himself concealed therein with the like intent."

The effect of this provision of the Code has not been determined, but it may be inferred from many intimations by our

courts, that whenever the question shall be presented, it will be held that the law is inoperative.

The former joint debtor act had no qualification, yet the courts held that the judgment was only *prima facie* evidence against the party not served. The Revised Statutes limited the effect of the judgment, so that it should only be evidence against the party not served, of the amount of liability, when his liability should be established by other evidence; but it has been held, that it is not evidence for any purpose. (See *Mervin* vs. *Kumbel*, 23 *Wend.*, 293.)

In *Oakley* vs. *Aspinwall*, 4 *Coms.*, 513, Bronson, C. J., said, "Under our form of government, it is questionable, to say the least, whether the legislature can, in any case, without an express license from the people, authorize a judgment which shall be in *personam* against a defendant who neither appeared nor was in any way served with process. That State must not boast its civilization where the legislature has power to provide that a man may be condemned unheard."

The principle maintained by our courts that a judgment is of no effect without service of process, or a voluntary appearance, has been recognized by the courts of other States in the following cases: *Bissell* vs. *Briggs*, 9 *Mass.* 462: *Hall* vs. *Williams*, 6 *Pick.*, 232; *Aldrich* vs. *Kinney*, 4 *Conn.*, 380; *Steel* vs. *Smith*, 7 *Watts & Serg.*, 447; *Harman* vs. *Taylor*, 2 *Vern.*, 65; *Ewer* vs. *Coffin*, 1 *Cushing*, 23.

In *Gleason* vs. *Dodd*, 4 *Metc.*, 333, the record of a judgment in Maine recited, that the death of the original plaintiff was suggested, and that "*the administrator then came in.*" It was held that the record was only *primâ facie* evidence of the appearance of the administrator, and could be rebutted.

*Downer* vs. *Shaw*, 2 *Foster*, (*N. H.*) 277, a record of a judgment recovered in Vermont was produced, in which record it was recited, that *defendant was notified of the proceeding,*—it appeared also by a recital in the writ that defendant was a resident of New Hampshire—it was held that the record was not sufficient to prove service, so as to give the court jurisdiction.

Perley, J., says, "the record states the legal conclusion of the court, and not the facts upon which they adjudged that notice had been given. Such general statement would have been wholly insufficient in an officer's return, and it is difficult to see why it ought to have any greater effect in a foreign record."

In *Harris* vs. *Hardeman*, 14 *How.*, *U. S.*, 334, Daniel, J., said that "in all judgments by default, whatever may affect their competency or regularity, every proceeding inclusive of the writ and indorsement thereon, down to judgment itself, is part of the record, and is open to examination." And the judgment in question in that case was declared void, notwithstanding the recital of service of the writ on defendant, inasmuch as by the return on the writ sufficient service was not shown. The Statute of Mississippi authorized service if defendant could not be found, by leaving a copy at defendant's usual abode, with his wife or some member of his family. The rule of the Circuit Court, U. S., authorized service by leaving a copy at defendant's usual abode, twenty days before the return day. The return on the writ was, "Executed on the defendant by leaving a true copy at his residence." This was held to be insufficient to give the court jurisdiction either under the statute or the rule of court.

In the New Jersey decree the subpœna and return are a part of the record. The return is without date, and does not show the manner in which service was made—if by copy, it was required to have been done ten days before the return day, (*Winan's Dig.*, 89, § 9,) the omission to state which, is a fatal defect according to the case last cited. The return is equally defective as proof of personal service. It should have stated that the service was personal.

The decree would not, therefore, upon general principles, be sustainable even in the courts of New Jersey.

It is not necessary, however, to go to the courts of New Jersey to get relief.

In *Hall* vs. *Williams*, 6 *Pick.*, 232, Parker, C. J., considered the argument that the judgment was valid in the State where rendered, until set aside, as of no weight.

It might (said he) be good there until reversed, but a person who was not within the State by whose court the judgment was rendered, is not bound to go there to get relief. " If not, then he may treat the judgment as a nullity, and the courts here will so treat it, when it is made to appear in a legal way, that he was never a proper subject of the adjudication."

2. The second proposition which I stated that although the record of such judgment or decree should show on its face the service of process, or voluntary appearance of the party, such fact may be controverted, is sustained by many of the cases already cited, particularly *Starbuck* vs. *Murray*, 5 *Wend.*, 148 ; *Shumway* vs. *Stillman*, 6 *Ib.*, 447 ; *Noyes* vs. *Butler*, 6 *Barb.*, 613. See also *Kent's Com.*, 260, *n.*, 6*th ed.*

The decisions of the Supreme Court of the United States in the cases of *Mills* vs. *Duryee*,' 7 *Cranch*, 481; *Hampton* vs. *McConnell*, 3 *Whea.*, 234, and *McElmayne* vs. *Cohen*, 13 *Peters*, 312, will be found, when properly understood, not to conflict with the decisions of the State courts. The law of *Congress of* 1790, providing, that records and judicial proceedings shall have the same faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the State from which they are taken, could not have been intended to make such records conclusive, against parties who were never within the jurisdiction of such courts. This would be giving *greater faith* to a record of another State, than would be given to a judgment in our own State. Such a judgment in the courts of this State would be held void, and although a motion for that purpose might be necessary, that is only a matter of form. It could certainly not be required of a citizen of this State, to go into another State for the purpose of making a motion to set aside a judgment in an action to which he was never a party.

*Wayne, J.*, says, in the case cited from Peters, that the law above referred to, " means that such records are conclusive upon the defendant in any State, except for such causes as

would be sufficient to set aside the judgment in the courts of the State in which it was rendered." The want of notice would be such a cause in the courts of every State ; and it is consistent with this decision that the courts of this State when such a record is produced, should declare it void, for a cause which in the State where it was rendered, would be a sufficient ground for setting it aside. If any greater latitude of construction should ever be asserted by the United States Supreme Court, it can be foreseen that it would not be submitted to by the courts of this State.

3. The third proposition, viz., that the omission of defendant to take proceedings to set aside a void judgment, will not operate as an estoppel, it is unnecessary to discuss, as it is conceded by the counsel in this case for the adverse party.

4. The fourth proposition that a decree may be impeached for want of jurisdiction—that is to say, if jurisdiction is given to grant a divorce for five years' desertion, and continued residence in New Jersey during that time, and it appear that there was no such residence, that a decree would be void, is certainly sustainable upon principle. The only question that would be at all open to discussion, would be, whether a decree, showing upon its face that there was jurisdiction, would exclude the defendant from showing the contrary, which is the question discussed above. The general principle is, that a party is never precluded from showing fraud or want of jurisdiction ; and this is so in respect to a decree of divorce in a foreign country, even between citizens of that country, whenever such decree is brought before our courts for adjudication. (*Story's Confl. of Laws*, § 545, 550, & 605 ; 1 *Green. Ev.*, § 546, *n.*; 1 *Craup. Mels. & Ros.*, 277.) For the same reasons, it is equally allowable to inquire into the jurisdiction of a court of another State, in which case the question would be, whether by the law of such State, the court had jurisdiction. (*Story's Confl. of Laws*, § 609, & 682, *n.*; 1 *Green. Ev.*, § 548.)

The fifth proposition it is unnecessary to discuss, as it is conceded that service was not made in this case by leaving

a copy of the writ at the last place of abode of the defendant. It is to be assumed that there was no service, if personal service was not made.

Assuming then the principles above stated as applicable to this case, I shall refer briefly to the evidence.

A record was produced from the Court of Chancery of New Jersey, to prove the divorce of Mrs. Black, in which it is stated, that the ground upon which the decree was made, was her continued abandonment of her husband five years, during which time she resided in New Jersey. This is averred in the complaint, and recited in the decree.

By the laws of New Jersey, (*Nixon's Digest*, 205,) the court shall have jurisdiction to decree a divorce for desertion, when complainant or defendant is a resident of the State at the time of filing the bill, " *and shall have been a resident of the State for the term of five years, during which such desertion shall have been continued.*"

The bill appears by the record to have been filed on the 18th of September, 1849,—the subpœna is tested on the 20th of September, and is returnable on the 8th of October of the same year. This subpœna has indorsed on it,

" Served, William Frame, Sheriff."

The time of the service, or by whom made, is not mentioned in the return.

The mode of service is prescribed by statute, to be either on, the person or by copy left at the dwelling-house or usual place of abode of the party to whom it is directed, ten days prior to its return. (*Nixon, p.* 89.)

The evidence in this case is, that Mrs. Black was not in New Jersey at any time within which service could have been made. She left New Jersey before the 20th of August, 1849. Mr. Weld refers to a letter bearing that date, which was after she had left. Mr. Gray refers to a memorandum in his cash-book, made on the very morning that she left, on the 20th, to go to Connecticut. Mr. and Mrs. Waldo testify that she came to Connecticut on the 21st of August, and did not leave there until the 12th of October, during all which

time she was staying with the Waldos. She was dangerously ill, and not absent during any part of that time. The date of her leaving is fixed by various documents, which are in the possession of the Surrogate.

It is also proved that when she left Mr. Weld's house in 1849, it was with the intention of not returning there again, and that, in fact, she did not return, except to take away her things, which was in the latter part of October, after she had come back from Connecticut, and then only for a single night.

While she was absent, a man called to serve a paper, which Mr. Weld supposed had something to do with a divorce, from the names of the parties. It was not Mr. Frame, the sheriff, but according to the description given of the persons employed by the sheriff, and Mr. Weld's recollection of the man who called, it must have been one Reynolds, who worked for the sheriff.

When Mr. Weld next saw Mrs. Black, which was after her return from Connecticut, he asked if she had been served with a notice at the suit of Mr. Black, and on her replying that she had not, he informed her that some one had called at the house to serve a paper. She expressed some surprise, and seemed disturbed, and in order to quiet her mind, he offered to make inquiry. He did so, and was advised by the person he consulted (he thinks Mr. Frelinghuysen) that Mrs. Black need have no uneasiness, as no proceeding could be taken without service of process upon her. This he communicated to her when he saw her—he might have sent word before, as he had the opportunity of sending often to New York.

The residence of Mrs. Black was satisfactorily proved to have been in the city of New York, to the spring of 1848, when she went to Mr. Weld's, in New Jersey, where she remained till August, 1849, after which she made a visit to Connecticut, and then went to Brooklyn to reside.

Upon these facts it is clear, that the Chancellor of New Jersey had no jurisdiction to grant a divorce, whether process was served or not.

As respects the service of process, the evidence to show such service consists, 1. Of the return of the sheriff; 2. The statement of two colored people and of a grocer, that Mrs. Black was in Belleville in September.

As to the return of the sheriff, it does not purport that the service was made by *himself*—the process might have been given to Reynolds, and he may have made an erroneous or false report. At all events, the return is but *prima facie* evidence; it is not equal even to an *ex parte* affidavit.

The colored people have no recollection as to time—they only remember that Mrs. Black made a pair of pantaloons for the witness Brown. The grocer has no knowledge, except that he sent things by Brown to Mrs. Black, and that he came in September, 1849; but he has no entries in his books of any thing sent to Mrs. Black, and he also admits that Brown was often employed by the day before that.

It is almost certain that these witnesses are mistaken in the year; it must have been 1848, and not 1849.

From all the evidence, therefore, the Surrogate must come to the conclusion, that no service of process was ever made upon Mrs. Black.

The extraordinary character of the proceedings in New Jersey is calculated to induce suspicion. It was well known to the complainant in that suit that Mrs. Black had never resided in New Jersey till 1848, and yet, his attorney made a deposition that she had admitted to him that she had always lived there, after leaving Mr. Black,—a period of 13 years.

Another witness was also procured to testify that Mrs. Black had lived in New Jersey thirteen years, who has sworn on this trial that she did not know any thing about Mrs. Black's residence.

There might seem to be a sort of equity growing out of the fact, that Mrs. Black had allowed it to be supposed that she acquiesced in the decree; but, so far as we are informed, she never heard of the decree, until she learned the second marriage of Mr. Black, until which time, she could not have supposed that a decree could have been obtained.

Mrs. Black claims that her separation from her husband was for a justifiable cause; that no decree for a divorce could have been obtained for any act committed by her; and that if any decree could have been had, the court would have made some provision for her out of her husband's property, if she had appeared and been heard. The right which she had then, she claims still exists, and that justice can be done to her without involving the penalties which would have been incurred by others, if the decree had been declared void in the life of Mr. Black.

She therefore claims administration of the estate upon the same ground that she will insist upon her distributive share.

D. B. TAYLOR,
L. S. CHATFIELD, *for Administratrix.*

Mrs. Elizabeth Black having made the necessary proof to establish the fact that she is the widow of John Black, deceased, letters of administration were issued to her, under our statute, and she entered upon the administration of the estate.

Since the granting of letters to Elizabeth, Rebecca Black has filed her petition, alleging that she was married to John Black in 1825, and is now his widow, and entitled to administer upon his estate, and praying that such letters issued to said Elizabeth may be revoked, and letters granted to her as such widow.

This application is resisted on the ground that by a decree of the Court of Chancery of the State of New Jersey, entered of record in the term of March, 1850, the marriage contract between John and Rebecca was dissolved; and the sole question to be determined, so far as the right to letters is concerned, is, whether the said Court of Chancery had such jurisdiction of the subject-matter and of the person of the defendant as to enable it to pronounce the decree.

This question depends primarily on the statutes of New Jersey, and the practice of the courts of that State in applying its remedial law.

By statute in New Jersey, the Court of Chancery has power

to grant divorces for a variety of causes, among which is the wilful desertion by either of the parties, of the other, for five consecutive years.

And the statute provides that the defendant shall, at the time of commencing the proceedings, be an actual resident of the State, and shall have resided in said State separate from the other party, five years prior to the commencement of the proceedings.

The statute also provides that the subpœna to appear and answer, may be served personally, or by leaving a copy at the place of residence of the defendant.

The *evidence* of service required by the practice of the courts in that State, if served by an officer, is the return of the process, with the word " served " or " cited " indorsed thereon.

The bill of complaint alleges the marriage of the parties, the wilful desertion and separate residence of the defendant for twelve years, that she had been an actual resident of New Jersey for ten years, and that she was an actual resident of the State at the time of filing the bill, setting up all the facts necessary to confer jurisdiction, and to entitle the plaintiff to the relief sought.

The bill was filed on the 18th September, 1849, and a subpœna to appear and answer issued, returnable on the 8th day of October thereafter.

The subpœna was returned with a return indorsed thereon, " served," Wm. Frame, Sheriff, and it was shown that this was performed on the 26th September, 1849, more than ten days before the return day of the writ, that Frame was the Sheriff of the County of Essex, that he is now dead, and that the return is in his own proper handwriting.

On the return of the writ and proof of no appearance of the defendant, the court subsequently made an order referring it to Mr. Cassidy, a master of the court, to take proof of the facts alleged in the bill.

Proofs were taken under the said order by the master, and by the proofs it was shown that the defendant at the time of

filing the bill was an actual resident of New Jersey, and had been an actual resident of that State for thirteen consecutive years, that she had abandoned her husband without other cause than religious scruples, and had without cause lived separate from her husband for a period of thirteen years. On these points, the proof was direct, *positive and full.*

On the coming in of this report, the decree of divorce was pronounced, duly enrolled, and made matter of record.

The validity of this decree is attacked on the grounds :—

1. That the defendant was not a resident of New Jersey at the time of the commencement of the suit.

2. That she had not resided in that State five consecutive years, prior to the commencement of the proceedings.

3. That the subpœna to appear and answer was not served on her, either personally or by leaving a copy at the place of residence ; and,

4. That she did not appear in the cause.


I. The effect and validity of the decree, when sought to be enforced in New York, depend very materially on a provision of the Constitution of the United States, and the judiciary act of Congress, of May 26, 1790.

Section 1, of art. 4, of the Constitution provides that " full faith and credit shall be given in each State to the public acts, records, and *judicial proceedings* of every other State, and the Congress may by general laws prescribe the manner in which such acts, records, and proceedings shall be proved, *and the effect thereof.*"

The provision of the act of May 26, 1790, is " The said records and judicial proceedings authenticated as aforesaid, shall have such faith and credit given to them in every court within the United States as they have by *law or usage* in the courts of the State from whence said records are or shall be taken."


II. This record, being in itself a complete record, showing jurisdiction in the court by which the judgment was pro-

nounced, the question here is, how far and in what manner it can be impeached or avoided in this proceeding.

If this were a novel question, it seems clear upon the words of the act, under the authority conferred upon Congress, that the same *effect* must be given to it here, that it would receive in New Jersey, according to the *law* and *usage* of that State. And it is respectfully submitted that upon the authority of the adjudications under the act of 1790, such must be the rule to be applied by this court.

It is cheerfully conceded that if the Court of Chancery of New Jersey never acquired jurisdiction of the subject-matter, or of the person of the defendant, the decree is void, and would be void in New Jersey. But suppose the Court of Chancery in that State should be moved to set aside this decree on the ground of a want of jurisdiction, or the decree should be attacked in a collateral proceeding on that ground, what would be the answer of the court? Simply this:—1st. It was shown to us according to our *law* and *usage*, that the defendant at the time of the commencement of the suit was a resident of the State, and had been for thirteen years; and 2d. Our sheriff has returned to us, that the process necessary to bring in the defendant, was served on her in due time, and we cannot allow these facts to be controverted after judgment, unless fraud is alleged.

III. Every court is, *ex necessitate rei*, a judge of its own jurisdiction, and when its judicial judgment is exercised on facts before it tending to establish jurisdiction, its judgment is final. This principle has been repeatedly adjudicated in this State under the justice's act, and in other cases. *Loder* vs. *Phelps*, 13 *Wend.*, 46; *Schroepel* vs. *Taylor*, 10 *Wend.*, 145; *Adkins* vs. *Brewer*, 3 *Cow.*, 206; 20 *Wend.*, 145; *Sheldon* vs. *Wright*, 1 *Selden*, 497.

IV. Again, the presumptions of law in favor of the record are strong, and are to be overcome only by the most direct and positive proof,

1st. That the sheriff did his whole duty on the process received by him for service and his return being silent as to the mode of service, he is presumed to have served it in the manner required by law. *Downing* vs. *Rugar*, 21 *Wend.*, 178; *Barhydt* vs. *Valk*, 12 *Wend.*, 145; *Williams* vs. *East Ind. Co.*, 3 *East.*, 192.

2. Where the record is silent as to jurisdictional facts, the law presumes jurisdiction in a court of general jurisdiction, until the contrary is shown. The general principle is that every presumption is in favor of the jurisdiction of the court, (*Shumway* vs. *Stillman*, 4 *Cow.*, 296,) and jurisdiction will be presumed where the record does not show it on its face. *Peacock* vs. *Bell*, 1 *Saund.*, 74; *Wheeler* vs. *Raymond*, 8 *Cow.* 311; *Kempes' Lessee* vs. *Kennedy*, 5 *Cranch*, 173; *Foot* vs. *Stevens*, 17 *Wend.*, 483.

V. Here the record shows jurisdiction on its face, both of the subject-matter and the person, and it is contended that it is *conclusive.*

The cases in the federal courts on this subject are in harmony with the Constitution and the judiciary act.

In *Mills* vs. *Duryee*, 7 *Cranch*, 481, an attempt was made *arguendo* to limit the power given to Congress to declare the effect of a judgment of another State, to the effect simply of the authentication upon the question of its admissibility as evidence. But the court say "this argument cannot be supported. The act declares that the *record* duly authenticated shall have such faith and credit as it has in the State from whence it is taken. If in such court it has the faith and credit of evidence of the highest nature, viz. *record* evidence, it must have the same faith and credit in every other court. It only remains then to inquire in every case what is the effect of a judgment in the State where it is rendered." In *Hampton* vs. *McConnel*, 3 *Wheat.*, 234; *Armstrong* vs. *Carson's Ex'rs.*, 2 *Dallas*, 302, the same doctrine is affirmed.

And the question is very fully considered in *McElmoyle* vs. *Cohen*, 13 *Peters*, 312, and the principle is stated on page

326 of the report as follows:—"What faith and credit then is given in the States to the judgments of their courts. They are record evidence of a debt, or judgments of record, to be contested only in such way as judgments of record may be, and consequently are *conclusive* upon the defendant in every State, except for such causes as would be sufficient to set aside the judgment in the courts of the State in which it was rendered."

In other words, as has been said by a commentator upon the Constitution, "If a judgment is conclusive in the State where it is pronounced, it is equally conclusive everywhere; if re-examinable there, it is open to the same inquiries in every other State." (*Story Com.*, § 1307.)

These authorities show the true interpretation of the federal Constitution by the federal courts, and unless the principle of these cases is shaken by controlling State authority, they must govern this case.

Suppose John Black had died in New Jersey, and this question had been presented to the surrogate of the county in which he died, would that court have listened for a moment to proof, or a suggestion, contradicting a record of one of the highest courts of the State, *containing on its face* the fullest evidence of the jurisdiction of the court by which it was pronounced? Nothing is more clear than that he could not entertain such an inquiry.

It is admitted that matter *dehors the record* showing a want of jurisdiction, or that the judgment has been subsequently discharged, may be given in evidence, but nothing in conflict with the record can be shown *where the defendant was a citizen of the jurisdiction pronouncing the judgment.*

VI. The cases in this State are not inconsistent with this proposition. *Borden* vs. *Fitch*, 15 *John.*, 121, simply shows, that when jurisdiction *is not shown on the record*, and the defendant was not served and did not appear, and was never within the territorial jurisdiction of the court, the judgment is void.

The several cases of *Shumway* vs. *Stillman*, 4 *Cow.*, 292;

5 *Wend.*, 148; 6 *Wend.*, 453, were all cases of a non-resident defendant, and *where no process was served*, but an appearance, by attorney, was set up as the only fact giving jurisdiction. In these cases, the demurrer admitting that the attorney had no authority to appear, the court held, that this fact showed a want of jurisdiction, the court having acquired jurisdiction by the appearance of the attorney only. And in the last case it was put on the true ground, that showing a want of authority, did *not contradict the record.* The conclusions arrived at by the court are thus stated by Chief Justice Savage : "The judgment of a court of general jurisdiction in any State in the Union, is equally conclusive upon the parties in all the other States as in the State in which it was rendered. This, however, is subject to two qualifications : 1st. If it appear by the record that the defendant was not served with process, and he did not appear in person or by attorney, such judgment is void. 2d. If it appear by the record that the defendant appeared by attorney, the defendant may disprove the authority of the attorney to appear for him." The spirit of this decision is sustained by *Hall* vs. *Williams*, 6 *Pick.*, 232, in which the court say : "If it had *appeared by the record* that the defendant had notice of the suit, or appeared in defence, we are inclined to think it could not be gainsaid."

In *Harrington* vs. *The People*, 6 *Barb.*, 607, the *record did not show* jurisdiction, but the contrary, and being a special tribunal, the judgment was void within all the cases. What Judge Paige says, therefore, about the rights of a defendant to disprove jurisdictional facts, contained in a record, was entirely *obiter*, nor is his *dictum* sustained by the cases cited in support of it. He cites *Starbuck* vs. *Murray*, 5 *Wend.*, 148, and *The People* vs. *Cassels*, 5 *Hill*, 164. The former was one of the cases on demurrer above examined, where no service and want of jurisdiction was admitted by the demurrer, and the other arose on a commitment by a justice of the peace of this State for contempt. To sustain the authority of the commitment, it was necessary to show that

the justice had jurisdiction of the cause in which Cassels was sworn as a witness, and in which he had been guilty of a contempt for refusing to testify. It turned out that the justice was taking cognizance of a crime alleged to have been committed in another county. The court very properly said that he had not jurisdiction of the person or subject matter; but I am unable to see that this case approaches the point here litigated. *Andrews* vs. *Montgomery*, 19 *John.*, 162, followed *Borden* vs. *Fitch*, as did *Bissell* vs. *Briggs*, 9 *Mass.*, 462.

In no case has it been held, that where the record showed that the defendant was *served* with process, he could controvert that fact to avoid the judgment, but the contrary was held in *Mills* vs. *Duryee*, and the cases which followed it. In not one of the cases, in our courts, did the record show service; nor in a single one where the judgment was of a court of general jurisdiction, did it show the defendant to have resided within the territorial jurisdiction of the court.

In the case of *Sheldon* vs. *Wright*, recently decided by the Court of Appeals, and reported in 1 *Selden*, 497, I understand the principle to be settled, that if the defendant is a non-resident, and the record shows personal service within the jurisdiction of the court, or if he is a citizen and resident within such jurisdiction, and has been notified in the manner allowed by the local law, the record is conclusive, and cannot be contradicted. And I find these broad principles decided in that case, "that when a court or judicial officer in the exercise of rightful functions, adjudges upon a matter, that judgment is final between the parties and other persons claiming under them, and is conclusive upon the facts which it embraces."

Again: "that when notice of judicial proceedings is prescribed by statute (or the 'laws and usages' of a State), and the parties reside within the territorial jurisdiction of the State and court, a notice in the mode designated is sufficient to give the court jurisdiction;" and if it appears by the record that the notice was given, it is conclusive.

This is not the case stated by Mr. Justice Marcy in *Star-*

*buck* vs. *Murray*, 5 *Wend.*, and Justice Paige in *Harrington* vs. *People*, 6 *Barb.*, where the only proof of jurisdiction appeared by way of recital in the record, and it is not obnoxious to the objection there made, that a court cannot give itself jurisdiction by saying in the record that it has it. Here the jurisdictional *facts* were submitted to the Court of Chancery and adjudicated, and enough was shown by way of proof to sustain its jurisdiction, even had it been a court of limited jurisdiction.

I cannot think the doctrine of those two cases sound or sustained by authority, when applied to a court of general jurisdiction : if the court intended to say anything more than the facts of those cases demanded, and that is, that where the record does not show jurisdiction in the one case, or the collateral fact of a want of *authority* to appear is admitted by demurrer in the other, the presumption may be overcome by proof. As against a resident defendant, I take it that the statement of service of process, or of appearance, in the record is conclusive, and cannot be disproved, for the principle affirmed over and over again is, that a record void for want of jurisdiction is a nullity, and not voidable, and it can hardly be that the adjudications of courts of general jurisdiction on jurisdictional facts, evidenced by the record, can be overhauled in collateral proceedings. No court has ever decided that this may be done, and it seems to me that the principle of the cases shows this record to be conclusive as against the defendant and incapable of impeachment, and the proof of service furnished by the record being affirmative proof, it is within the rule as stated in 6 *Wend.*, 450.

VII. Another principle decisive of this case, and fully sustained by authority, is, that as between the parties the return of an officer on process, returnable in its nature, is *conclusive*, and not liable to collateral impeachment. This is a well established general rule, one necessary to secure the rights of the parties, and give validity and effect to the acts of ministerial officers, leaving the parties to their redress by action, if the return is false. This is emphatically true of process

by which a defendant is brought into court, for as service by an officer is the only mode of bringing the party in, his return is the only evidence of service, and as this return ordinarily gives jurisdiction of the person, the court will not allow it to be traversed directly or indirectly. (*Small* · vs. *Hodgen*, 1 *Litt.*, 16; *Bean* vs. *Parker*, 17 *Mass.*, 601; *Slayton* vs. *Inhabitants of Chester*, 4 *Mass.*, 479; *Whitaker* vs. *Sumner*, 7 *Pick.*, 551; *Caldwells* vs. *Harlan*, 3 *Monroe*, 351; *Boynton* vs. *Willard*, 10 *Pick.*, 169; *Whiting* vs. *Bradley*, 2 *New Hamps.*, 79; *Hawks* vs. *Baldwin*, *Brayt.*, 85; *Estabrook* vs. *Hapgood*, 10 *Mass.*, 313; *Wheeler* vs. *Lampman*, 14 *Johns.* 481; *Hunter* vs. *Kirk*, 4 *Hawks.*, 277; *Case* vs. *Redfield*, 7 *Wend.*, 398; *Stinson* vs. *Ludlow*, 1 *Farif.*, 263; *Putnam* vs. *Man*, 3 *Wend.*, 202; *Dyckman* vs. *Mayor*, &c., *of N. Y.*, 1 *Seld.*, 440; *Sheldon* vs. *Wright*, 1 *Seld.*, 514.) The current of authorities *inter partes*, is uniform, and they show that all the evidence in this case tending to impeach the return, is inadmissible and should be excluded.

The service and mode of service not only appear in the record and are *conclusive* on the question of jurisdiction as it stands there, but the original writ was produced and the return proved in this court, so that as matter of evidence it no longer remains a recital on the record.

The return, if *conclusive*, disposes of the question of jurisdiction of the person. The conflict of evidence in this case demonstrates in an eminent degree, the wisdom and safety of the rule which holds the return to be unimpeachable.

It must be borne in mind that this petitioner had become a denizen of New Jersey, and owed allegiance to its authority; that she was a citizen of that State; that the process was issued by its high Court of Chancery; that the officer making the return was the sheriff of the county of her residence, and acted under oath; that the return was made to a court not only competent but willing to do full justice, and able to correct any mistakes or errors of its sheriff in due time and before judgment; and that the return gave full jurisdiction of the person of the defendant, on which the court could

proceed according to its "usage." If in every case this return could be collaterally impeached by a citizen, or traversed in the case, the wheels of justice would be stopped, and all confidence and safety in judicial proceedings would be at an end. No rule can, with convenience and safety be adopted, but to hold the return of the officer on process, to be conclusive on the parties, leaving the party injured by a false return, to his remedy by action against the officer.

VIII. The question of five years' prior residence was in no sense a jurisdictional question. The Court of Chancery has general jurisdiction of divorces, but can legally grant them only in cases provided by law, and the complainant, to entitle himself or herself to the relief, must *prove* a case within the statute. So here our court can divorce, *a vinculo*, only for adultery, and adultery must be alleged in the bill to uphold a decree, but nobody ever supposed that adultery or no adultery is a jurisdictional question. It is simply matter of allegation and proof, and a decree may be made when it appears, or withheld when it does not. By way of illustration, suppose a bill filed in New York, in which adultery is well alleged, but on the hearing the party fails to prove it, and is dismissed. Is the bill dismissed for want of jurisdiction?—clearly not. So in New Jersey, a bill is filed for wilful abandonment, and the abandonment, and five years prior residence are well alleged, but on the hearing the party fails to prove either, and is dismissed, or he proves abandonment, but not five years' prior residence, or *vice versâ*, and fails. Is he dismissed for want of jurisdiction?—certainly not—but fails because he has not made the *necessary proof* to entitle him to a decree. Again, suppose on the hearing, three witnesses prove residence in New Jersey, and three show it somewhere else, but the Chancellor thinks, all things considered, that the fact of residence in New Jersey is sufficiently established, and so decrees. Does he do so at the peril of being considered a trespasser, for want of jurisdiction? and in a collateral action, is his decree to be overhauled because the defendant can bring one more witness to his side of the case? The subject matter of

divorce is always within the jurisdiction of the Chancellor; but he shall not grant it, unless the defendant has been brought in according to the "laws and usages" of the State, nor unless the condition precedent to the relief, of five years prior residence, is alleged in the bill and proved on the hearing. It is sheer nonsense to assert that this condition pertains in any degree to the jurisdiction of the court.

IX. There having been legal proof before the Chancellor:

1. That the process was served according to the laws of New Jersey.

2. That the defendant was a resident of New Jersey at the time of filing the bill.

3. That she had resided in that State, in a state of separation from her husband, for five consecutive years prior to the filing of the complainant's bill; and

4. That she had abandoned her husband wilfully and without just cause, the decree of the Chancellor is final and conclusive, and incapable of impeachment. This principle I understand to be fully settled in *Sheldon* vs. *Wright*, 1 *Selden*, 497, above cited. And this doctrine does not conflict with *Starbuck* vs. *Murray*, 5 *Wend.*, or *Harrington* vs. *The People*, 6 *Barb.*; for here the facts do not rest in a record recital, but the *proofs* on which the Chancellor acted are sent here, both as to service, and on the merits. But the determination of a court of general jurisdiction, on all subjects legitimately before it, must be held to conclude the parties, *quoad* all the matters passed upon, including as well all questions of jurisdiction as all others; and this, we believe to be, the general doctrine both here and in England. *Warrender* vs. *Warrender*, 9 *Bligh*, 89. These legal propositions, if well sustained, as we believe them to be, dispose of this case.

X. As to the question of personal service of the writ, a pregnant inference may be drawn from the fact, that no movement was made by the petitioner while the sheriff was alive. If she was served, she knew the sheriff could say,

when and where, but if not served, she ought to have known that his testimony would be most important to her. Having waited until after personal evidence of the fact was removed by death, it is fair to infer that she knew the fact existed and could be proved.

If this case turned on a fair balance of probabilities from the evidence and circumstances, I do not hesitate to say, that the preponderance is strongly against the petitioner; and the court, in favor of the comity due to the judiciary of a sister State, and in favor of the rights and reputation of the husband, the second wife, and of the family of the deceased, would so declare, especially against a voluntary alien from the household of her family for twenty years.

In conclusion, we hold the following propositions to be established.

1. That the record of the decree, divorcing John Black from Rebecca Black, being regular, and showing jurisdiction on its face, is conclusive upon the parties in New Jersey.

2. That the same faith and credit must be given to it here that it possesses in New Jersey, as record evidence of the facts contained in it, and as evidence of the decision of the court.

3. That the record, showing the defendant in the decree, to have been an actual resident of New Jersey at the time of the commencement of the suit, and for five years prior thereto, and by evidence taken under an order of the court, according to its practice and usage, and submitted to the court, is conclusive of those facts.

4. That the record, showing by the official return of the sheriff of Essex county, that the defendant was served with the subpœna to appear and answer, according to the laws and usage of New Jerey, is conclusive, and cannot be collaterally impeached.

5. That the return of a proper ministerial officer on returnable process, is conclusive upon the parties in the suit, and cannot be collaterally impeached.

6. That the return of the sheriff, whether true or false,

gave the court jurisdiction of the person, and the return cannot be traversed to take away the jurisdiction conferred by it.

7. That a record may be impeached only by showing matters *dehors* the record, to take away a presumed or apparent jurisdiction, but never by disproving service evidenced by a return.

8. That five years' residence is not a jurisdictional fact, but if it was, it has been submitted to the Court of Chancery of New Jersey, on proofs taken, and its decision is final.

9. That if the question of service or no service was an open question, the evidence of service preponderates, and should control to uphold a judicial decree, and protect innocent parties.

THE SURROGATE.—The intestate died in the month of March, 1856, and letters of administration upon his estate were granted to his son John, and Elizabeth, claiming to be his widow. In July, Rebecca Black filed her petition for the revocation of the grant of administration, on the ground that she was the widow, and Elizabeth was not the widow of the intestate. It now becomes my duty to decide upon these conflicting claims.

It appears that John and Rebecca Black were married on the 13th day of January, 1825, cohabited together about twelve years, and had issue two children. Some time in the year 1837, Mrs. Black left her husband, and thenceforth ceased to live with him. After this abandonment had continued eleven or twelve years, the husband cast about for the means of dissolving the matrimonial bond, and having been unsuccessful in an application to the legislature of the State of New York, he had recourse to the intervention of the Court of Chancery of the State of New Jersey, in which jurisdiction his wife had been previously residing, and he finally succeeded in procuring a decree of that court, declaring a divorce of the parties *a vinculo matrimonii.*

Wilful desertion by husband or wife for five consecutive

years, is, by the law of New Jersey, sufficient ground for divorce, but the statute provides that at the time of instituting the proceedings, the defendant shall have been an actual resident of the State, separate from the other party, for five years. The decree of the Court of Chancery which was entered in the term of March, 1850, recites the filing of the bill on the 18th day of September, 1849, that process of subpœna to appear and answer had been " duly issued and returned served, by the sheriff of the county of Essex," that the defendant had not appeared, and the complainant by depositions had shown satisfactorily to the court, " that the said defendant was an actual resident in the State at the time of the complainant's filing his said bill of complaint, that the defendant had been an actual resident of the State for the term of five years, during which said desertion had been continued, and the defendant had been guilty of wilful, continued, and obstinate desertion of her husband for thirteen years." Upon this state of facts appearing to the court, the decree of divorce was pronounced.

On looking into the proceedings, I find that all the material facts to give the court jurisdiction, were alleged in the bill of complaint, and established by the evidence. A subpœna to appear and answer was issued, tested the twentieth day of September, 1849, and returnable on the eighth day of October, ensuing. The process was regularly returned by the sheriff of the county of Essex, " served;" an order for taking proofs was entered the twenty-first day of December, 1849, wherein it was recited that the defendant had been " duly summoned by writ," and on the second day of January, 1850, depositions verifying the charges in the bill of complaint, were taken before a master in chancery. On their face, all the proceedings were regular, and no exception can be taken to their sufficiency.

This is the decree of a court of another State, and the question arises, what weight is to be attached to it in this State? The Constitution of the United States provides that " full faith and credit shall be given in each State to the

public acts, records, and judicial proceedings of every other State," and that " Congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof." Under the authority thus conferred, Congress by the act of May 26, 1790, provided a particular method of proving such records, and directed that when so proved, they should " have such faith and credit given to them in every court within the United States, as they have by law or usage, in the courts of the State from whence said records are or shall be taken." This language is plain, and by its obvious force requires the same faith and credit for a judicial record in all the States of the Union, as by law or usage it possesses in the State where the judgment is rendered. There was, however, at first in the early period of our judicial history, a disposition in the courts of New York, as well as in those of some other States, to refuse full credit to such records, and several decisions were made, holding that a judgment recovered in another State had no more effect in this jurisdiction than a foreign judgment, and was in fact to be treated as affording only *primâ facie* evidence of a demand, claim, or right, founded upon it. But after the case of *Mills* vs. *Duryee*, 7 *Cranch R.*, *p.* 481, in the Supreme Court of the United States, our tribunals receded from this ground, and admitted judgments in other States, fairly and regularly obtained, as full and conclusive evidence of the matters adjudicated. (*Andrews* vs. *Montgomery*, 19 *Johns. R.*, 162.) Still this doctrine has in this State always been held in subservience to the principle, that to entitle the judgment to full faith and credit, the court in which it was rendered must have had jurisdiction of the persons and of the subject matter. (*Borden* vs. *Fitch*, 15 *Johns. R.*, 121.) Jurisdiction of the subject matter, is to be tested by the authorized extent of the powers of the court, in regard to the alleged cause of action. In the present case, the Court of Chancery of New Jersey possessed jurisdiction to grant a divorce for desertion as charged in the bill of complaint. (*Elmer's Digest*, *p.* 130, § 1.) All the necessary allegations to justify the decree

for a divorce were proved, but whether proved or not, the court had power to try that question, did try it, and pronounced judgment. Having jurisdiction of the subject matter, the merits of their decision cannot be investigated and criticised collaterally in another tribunal. (*Bissell* vs. *Briggs*, 9 *Mass. R.*, 462.)

The only point remaining for solution, then, relates to the jurisdiction of the court in regard to the person of the defendant. There is no plausible ground for questioning the soundness of the rule, that no one is bound personally by judicial proceedings, without express or constructive notice. Notice of some kind is the vital breath to animate judicial jurisdiction over the person. It is the primary element of the application of the judicatory power. It is of the essence of a cause. Without it there cannot be parties, and without parties there may be the form of a sentence, but no judgment obligating the person. I think there can be no doubt as to the correctness of this doctrine and its foundation in natural right. It is based upon those principles of justice which are acknowledged wherever right reason has sway. It was recognized in England many years since, it has always been the law of this State, has been extensively received throughout the Union, and has received the approbation of the Supreme Court of the United States.

It is clear, then, that a judgment rendered by a court of competent jurisdiction in another State, may be questioned on the ground, that the defendant received no notice of the commencement of the suit. But in the face of this rule I am asked to hold, that if the record of the judgment contain recitals asserting the due service of process upon the defendant, such recitals are conclusive evidence of the jurisdiction of the court over the person of the defendant, and cannot be controverted. If a recital of formal notice to the defendant be conclusive, of course it cannot be contradicted, and then, in order that a court might obtain jurisdiction, it would only be necessary to recite that it had jurisdiction. This would be an edifice without a foundation—a process of structure

similar to that noticed by the satirist as building from the roof downwards. The right of personal notice, express or constructive, would be a mere shadow, if exposed to this mode of subversion. It would rest in mere name and not in substance. The right to impeach a record, for want of personal jurisdiction, whose recitals asserting personal jurisdiction are conclusive, is the right to impeach a record which is unimpeachable—a proposition absurd and self contradictory in its very terms.

We come down then to the position that the defendant, in answer to this record and the decree of divorce, is not estopped from showing that she had not any legal notice of the institution of the suit, was not in fact made a party to it, and is not therefore bound by the judgment. I shall first consider the facts bearing upon this point, and then state the rules of evidence applicable to them.

The subpœna to appear and answer the bill of complaint, was issued on the 20th September, 1849, returnable on the 8th of October, and was entered by the sheriff as served on the 26th of September. The defendant alleges that she was in the State of Connecticut the entire period covered by these dates. Prior to this time, Mrs. Rebecca Black had been living in Belleville, in the county of Essex, New-Jersey, at the residence of Mr. Weld. Mr. Weld states that in the summer of 1849, she had been sick, and her physician advised her to leave Belleville—that she went to visit some friends at Scotland, in the State of Connecticut, the latter part of July or early in August, and did not return to his house again, until the end of October or beginning of November, at which time she stayed one night. Mr. Gray, the brother of Mrs. Black, from memoranda entered in a cash account book, testifies that on the 8th of August, 1849, he went to Newark, from Belleville, and on the succeeding day returned to Belleville with his mother and sister—he remained at Mr. Weld's about a week, and then brought his mother and sister to New-York. From another entry in the same cash book, he says that his sister left New-York for Scotland on the 20th of August,

1849. Sarah Waldo, of Scotland, testified that Mrs. Black arrived at her house on the 21st of August, 1849, and remained there constantly until the 12th of October. Mr. Waldo, her husband, corroborated this statement fully.

On the other hand, Mr. Hay, stage proprietor at Belleville, stated that he frequently carried Mrs. Black in his vehicle to and from Belleville, and he did not think she left Mr. Weld's until after 1850 or 1851. Benjamin Brown testified that Mrs. Black made some clothes for him, when she was living at Belleville, and that this took place after he went to work for Holmes & Collard, merchants. Betsey Dawson, the mother of this witness, corroborates his statement. John Collard shows that Brown commenced working for him about the tenth of September, 1849, and verifies the date by an entry in his books. He also expresses a strong impression that Brown carried goods from his store to Mr. Weld's for Mrs. Black, after the tenth of September, 1849.

Is there any mode of reconciling this apparent conflict of testimony? Some of the witnesses must be mistaken, as to time and dates. From the letters exhibited by Mr. and Mrs. Waldo, it would seem to be clear that Mrs. Black was on a visit at their house in Scotland as late as October 12th, 1849, and from Mr. Gray's memoranda, it appears she left New York for Scotland on the 20th of August, 1849. Mrs. Waldo testifies that Mrs. Black paid her four visits at Scotland since 1847, and it is possible that the length and circumstances of one of these visits may have been confounded with those of another; but still, if confidence is to be placed upon the memoranda of Mr. Gray, Mrs. Black must either have visited Scotland twice in the summer and fall of 1849, or have made a protracted stay at that place from the 21st of August to the 12th of October. If, however, the visit which commenced on the 21st of August, took place in 1848, instead of 1849, the difficulty might be solved. This would harmonize with the fact stated by Mr. Gray, that he spent a week at Mr. Weld's, in August, and when he left, brought both his mother and sister with him, while on the other hand, Mr. Weld takes

no notice of this visit, and also states that the mother left his residence the spring or summer of 1849. Still, in opposition to this hypothesis, we have Mr. Gray's entries in his cash book, dated in 1849, and the general purport of the evidence of Mr. Weld and Mr. and Mrs. Waldo as to the duration of this visit, the sickness of Mrs. Black, and the year of the occurrence. In view of the testimony of Brown and of Collard, it would have been more satisfactory had Mrs. Weld, and the physician who attended Mrs. Black at Belleville, been examined. It is a pleasure to me that my view of the law does not compel a conclusion on the question of fact involved in the testimony of these witnesses. I see no reason for doubting the good faith and veracity of any one of them, and believe that whatever difference exists has arisen honestly from mistake.

The following propositions appear to me conclusive as to the binding obligation of the decree of divorce upon Mrs. Rebecca Black.

1. The record is presumptive evidence of jurisdiction. The idea will not be lightly entertained that a judicial tribunal has exceeded its authority, or undertaken to exercise it where it might not be lawfully exerted. The doctrine of our courts upon this point is expressed in *Shumway* vs. *Stillman*, 4 *Cowen*, 292 ; 6 *Wend.*, 447. " Every presumption is in favor of the jurisdiction of the court. The record is *prima facie* evidence of it, and will be held conclusive until clearly and explicitly disproved." The result of this rule is, that the defendant must disprove every mode of lawful service of process ; must show clearly, explicitly and affirmatively, that there was no lawful service. The mind of the court must not be left in doubt upon this point ; there must not be a mere balance of probabilities, but such a weight of evidence, as shall avail to overturn the opposing proof, and impugn the presumption of the truth of the record.

2. Mrs. Rebecca Black, at the time of the institution of the suit for divorce, was a resident of the State of New Jersey. She had been living there over a year, if not longer ; occu-

pied furnished apartments, and had there a fixed and permanent place of abode.   Mr. Weld states, that she left in July or August, with the intention of not returning; but a change of residence does not rest in mere intention—the domicil can be altered only by a conjunction of the fact with the intention.   Her visit to Scotland was certainly only for a temporary purpose, and not with the design of making her abode at that place.   Her establishment at Belleville was not broken up; her furniture was not removed until after her return from Connecticut, and a domicil in New York was not acquired before that period.   As a resident and citizen of New Jersey, she was amenable to its laws, and bound by their provisions relative to constructive service of process.

3. By the statute of New Jersey, a subpœna to appear and answer, may be served on the defendant, personally, or by leaving a copy thereof at the defendant's " dwelling-house or usual place of abode, at least ten entire days prior to its return."   (*Elmer's Dig.*, *p.* 56, § 7.)   The sheriff is required to sign the return, and on the subpœna being returned " served," the cause proceeds. (*Elmers's Dig. p.* 57, § 13 ; *p.* 512, § 16.)   That an effort was made to serve this process, appears from Mr. Weld's statement that a person called for that purpose, and exhibited the subpœna to him.   It is true, he also states, that no copy was left at that or any other time, but he can only give his own knowledge and hearsay on that point, and there may have been copy service without his knowledge.   He was not the only person about the premises. He knew the sheriff, and says the person who called with the subpœna was not the sheriff.   The return on the writ " served," is in the sheriff's own handwriting.   An entry in his own writing was made in his book, charging the " service, return and mileage," under date of the 26th of September, 1849.   It was proved, that whenever process was served by the general deputies, their names appeared on the return, and when by special deputies, their authority was endorsed on the writ.   The return, then, as made to the court, is an assertion on the part of the sheriff, that he made the service

himself. The character of that officer is shown to have been high and unimpeachable. If, therefore, there was no personal service of the subpœna, the presumption in favor of service by leaving a copy at the usual place of abode is not disproved.

4. As a matter of proof, the return of the officer is itself evidence of the facts alleged in it, and it cannot be impeached collaterally. Though untrue, it can be impugned only in an action for a false return, or on the indictment of the officer, or on an application to the court issuing the process, made by a party interested in the cause. (*Averill* vs. *Sheriff of Warwick*, 3 *Nev. & M.*, 871; *Gifford* vs. *Woodgate*, 11 *East*, 297; *Anon*, *Lofft*, 371; *Goubot* vs. *De Croux*, 3 *Tyr.*, 906.) The case of *Putnam* vs. *Mann*, 3 *Wendell*, 202, in the Supreme Court of this State, illustrates in the strongest manner the extent to which this doctrine will be carried. There the plaintiff, who was a constable, had returned to a justice that he had duly served the defendant with process at his own suit, when he had not. Judgment was entered, and the defendant, to his surprise, was arrested in execution, without ever having been notified of the commencement of the suit. In an action brought by the defendant against the constable and the justice, the court held, that the return was conclusive, and could not be collaterally impeached.

5. In my judgment, I am bound to hold, under all these circumstances, that there is sufficient proof in the case, of valid constructive notice to the defendant of the institution of the suit for divorce; that even if the sheriff's return could be impeached, it has not been done, and if there be any hypothesis consistent with the integrity of the sheriff's return, and the validity of the record, that hypothesis must be distinctly refuted. Service by leaving a copy at the usual place of abode is not only reconcilable with the return of the officer, but is not negatived with any clearness. It might have occurred without ever having been brought home to the knowledge of Mr. Weld. There was no motive for concealment—no ground for apprehending any opposition;

and the process was in fact exhibited to Mr. Weld. To suppose a violation of duty on the part of the sheriff, would, under such circumstances, require evidence so complete and stringent as would absolutely exclude any solution consistent with his innocence and integrity.

6. The court must have the less reluctance in concluding Mrs. Black by the decree of divorce, in view of the undoubted truth that she had notice in fact of the existence of the suit. She had voluntarily abandoned her husband, and lived separately from him for twelve years. She was well aware that he was anxious for a divorce if she would not return to his home; that an attempt had been made to procure it through the intervention of the legislature of this State, and that proceedings were contemplated for the same purpose in New Jersey. Mr. Taylor testifies, that in 1848 or 1849, he called upon her, requested her return to her husband, and that she refused on the ground of religious scruples. He says, that she stated her residence to have been in New Jersey ever since she had left Mr. Black, and he thereupon proposed that a divorce should be procured in that State. " She said she had no objections he should get a divorce." Mr. Waldo testifies " she knew there was an application, but did not know the time of the court, or when it was being done, till it was done. She knew there was something doing about it—that there were proceedings instituted on that subject. I got the general impression that the proceedings were in New Jersey. She said she never had been before the court in New Jersey, or had the opportunity. I don't remember that she said she had any notice of the proceedings." Mr. Gray states, that he heard something relative to the proposed divorce before his visit to Belleville, in July, 1849, and that "it was to be done in New Jersey." Mrs. Gray says, that Mrs. Black informed her she had met Mr. Taylor on the ferry-boat, " and asked him if he had got the divorce." Mr. Taylor's statement of what passed at that interview is, she said, " Well, Mr. Black has got his divorce—I am very glad of it." Mr. Weld shows that on Mrs. Black's return to New Jersey,

he informed her that during her absence some person had called to serve the process in the divorce suit, and that he took advice as to the effect of that act. It is quite obvious, therefore, from the evidence, that on the part of Mr. Black, his counsel, and the sheriff, there was no attempt at concealment. Mr. Black desired to be at liberty to marry again, and he did marry again, on the heel of this decree. With him there existed every possible motive to have the proceedings regular and valid. All the presumptions of law are in favor of his ignorance of any informality, and against a wilful commission of the high crime of bigamy. Nothing can be more certain than that Mrs. Black was fully apprised beforehand of the intention of her husband to bring the suit for divorce in the State of New Jersey; that she subsequently understood process had been issued for that purpose out of the Court of Chancery; and that she was ultimately informed the decree of the court had been obtained. Notice, in fact, is thus brought home to her. Then was the time to interfere. The sheriff was living, the facts were fresh, and any alleged irregularity might easily have been sifted. There was no difficulty in interposing a defence, or obtaining a hearing. The decree itself might have been opened upon good cause shown. If she was absent from the State, and there was no personal service of the process, it could have been proved without a doubt—if there was question as to service by copy, the question could readily have been solved. And yet she made neither sign, nor movement, nor objection, nor opposition. She permits the case to proceed quietly, when at any moment she might have been heard. She slumbers on, sufficiently conscious of the position of freedom her husband was anxious to attain, and of the unhappy condition in which a future wife might innocently be placed, if the proceedings were irregular, and never seems to have waked up to a full sense of her dormant rights, till her husband was in the grave, and his property was to be distributed. As between a party thus chargeable with notice and with laches, and one entirely innocent and without notice, there will be no struggle to in-

validate this decree—the intendment of the law in favor of the due service of process, the truth of the sheriff's return, and the jurisdiction of the court rendering the judgment, will be strengthened and not weakened, and even if the defendant were allowed to impeach the officer's return, she would be put to the most strict, convincing, and undeniable proof that service had not been made in either of the modes allowed by the statute of New Jersey. I am of opinion that service by copy at her residence in Belleville was sufficient, and that such service has not been disproved. This was constructive notice in law, and without passing upon the question of personal service, I am also satisfied that she had notice in fact of the pendency of the proceedings. I must therefore hold that the decree of divorce is valid, and that the second marriage of the intestate, with Elizabeth Black, was lawful and regular. As the widow of the deceased, she is entitled to letters of administration, and to a distributive share of his estate.